IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JANET L. CLEVENGER,

        Plaintiff,

        v.                            Civil Action No. 2:05-CV-93

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.


## REPORT AND RECOMMENDATION
## SOCIAL SECURITY


## I. Introduction

A.    Background

    Plaintiff, Janet L. Clevenger, (Claimant), filed her Complaint on December 21, 2005, seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on March 9, 2006.[2]  Claimant filed her Motion for Summary Judgment on April 10, 2006.[3]  Commissioner filed her Motion for Summary Judgment on May 10, 2006.[4]

B.    The Pleadings

        1.    Claimant's Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 11.

[4] Docket No. 14.

2. <u>Commissioner's Motion for Summary Judgment</u>.

C. <u>Recommendation</u>

I recommend that:

1. Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to the Commissioner so she may employ a physical medical expert to evaluate the nature and severity of Claimant's ailments and how those impairments affect her ability to perform work related functions, including whether her ailments meet or equal a Listing at step three of the sequential evaluation process.

2. Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

## II. Facts

A. <u>Procedural History</u>

Claimant filed an application for Supplemental Security Income on November 5, 1999. She filed her application for Social Security Disability Insurance Benefits on November 16, 1999, alleging disability since November 5, 1999. Both applications was denied and initially and on reconsideration. Claimant requested review by an ALJ. An ALJ denied her claim in a decision dated June 1, 2001. Claimant requested review by the Appeals Council. On December 23, 2003, the Appeals Council remanded the case to the ALJ for further proceedings. Upon remand, another hearing was held on August 19, 2004. The ALJ issued a decision adverse to Claimant on December 23, 2004. Claimant again requested the Appeals Council review the case, but it denied this request on November 15, 2005. This action was filed and proceeded as

set forth above.

B.     <u>Personal History</u>

Claimant was 43 years old on the date of the August 19, 2004 hearing before the ALJ.

Claimant has a high school education. Claimant has prior relevant work experience as an

insurance company clerk, customer service representative, packer, cashier, and secretary.

C.     <u>Medical History</u>

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: November 5, 1999 – December 23, 2004.[5]

**J. Thomas Peiffer, M.D., 2/10/93, Tr. 146**
Impression: no fracture of the left knee

**Dwight D. Im, M.D., M.D., 12/28/95, Tr. 147**
Impression: history of incapacitating pelvic pain, status post hysterectomy and excision of the
vaginal septum, mild vaginal cuff inflammation

**Noel S. Gressieux, M.D., (Undated), Tr. 148**
Diagnosis: synovitis in the left knee

**Noel S. Gressieux, M.D., 11/12/96, Tr. 152**
Diagnosis: calcific tendinitis, left knee

**Myles D. Brager, M.D., 1/16/98, Tr. 164**
Impression: probable mechanical block to left knee ROM secondary to either meniscal tear or
loose body.

**Richard H. Haar, 2/5/98, Tr. 168**
Impression: smoothly bordered and well defined sized nodular density in the inferior left breast,
appearing to be probably benign

---

[5] Much of the evidence in the record comes from before Claimant's alleged onset date of
disability. Commissioner asserts this evidence is relevant "for informational purposes only."
Def.'s Br. at 2. Yet evidence obtained prior to the alleged onset date may be relevant to the
instant claim. <u>See</u> <u>Tate v. Apfel</u>, 167 F.3d 1191, 1194 n.2 (8th Cir. 1999); <u>Burks-Marshall v.
Shalala</u>, 7 F.3d 1346, 1348 n. 6 (8th Cir. 1993); <u>Williams v. Barnhart</u>, 314 F. Supp. 2d 269, 272
(S.D.N.Y. 2004).

**Sang Lee, M.D., 10/23/94, Tr. 171**
Diagnosis: severe pelvic pain, acute appendicitis, severe pelvic adhesions

**Sang Lee, M.D., 10/20/94, Tr. 173**
Preoperative diagnosis: severe pelvic pain, pelvic adhesion
Postoperative diagnosis: same and appendiceal ovary adhesion

**Carl High, M.D., 6/10/99, Tr. 175**
Admitting impression: severe left lower quadrant pain associated with abnormal bowel movements
Discharge diagnosis: diverticulitis of colon with no hemmorhage, hypothyroidism

**Carl High, M.D., 5/17/99, Tr. 187**
Admitting impression: severe left lower quadrant pain associated with abnormal bowel movements

**Joseph Noronha, M.D., 7/13/99, Tr. 189**
Discharge diagnosis: acute abdominal pain with vomiting and diarrhea, etiology undetermined

**Joseph Noronha, M.D., 6/16/99, Tr. 199**
Admitting impression: abdominal pain

**Joseph Noronha, M.D., 7/24/99, Tr. 200**
Discharge diagnosis: chronic abdominal pain caused by severe abdominal adhesions

**Joseph Noronha, M.D., 7/7/99, Tr. 208**
Preoperative diagnosis: persistent abdominal pain from extensive adhesions documented on laparoscopy
Postoperative diagnosis: same

**Charles Kirkland, D.O., 3/15/99, Tr. 220**
Impression: acute muscle strain, left thigh

**Barry Barrows, M.D., 6/6/99, Tr. 223**
Impression: abdominal pain, questionable etiology

**Joseph Noronha, M.D., 6/11/99, Tr. 232**
Impression: smooth cyst on the lateral aspect of the lower half of the left kidney, which could be from the kidney or otherwise

**Peter Bala, M.D., 7/1/99, Tr. 234**
Preoperative diagnosis: abdominal and pelvic pain – suspected pelvic adhesions
Postoperative diagnosis: severe pelvic abdominal adhesions

**Alan W. Cashell, M.D., 6/8/99, Tr. 236**
Diagnosis: hyperplastic polyp, tubulovillous adenoma

**Peter Bala, M.D., 5/20/99, Tr. 238**
Impression: multiple nodular densities bilaterally, at least some of which are likely to represent intramammary lymph nodes

**Joseph Noronha, M.D., 6/11/99, Tr. 242**
Impression: smooth cyst on the lateral aspect of the lower half of the left kidney, which could come from the kidney or otherwise

**Joseph Noronha, M.D., 6/22/99, Tr. 244**
Impression: fast transit time through the small bowel loops, otherwise negative small bowel series

**Joseph Noronha, M.D., 10/5/99, Tr. 247**
Impression: status post hysterectomy, and bilateral oophorectomy

**Lucas Pavlovich, M.D., 11/17/99, Tr. 248**
Impression: minimal degenerative changes, without evidence for focal disc herniation or neural impingement, neural foramina narrowing at the L5-S1 level bilaterally, predominantly due to facet joint hypertrophy

**David Lee, 11/3/99, Tr. 252**
Assessment: sacroiliac arthritis

**Charles M. Paroda, D.O., 1/16/00, Tr. 254**
Impression: obesity, arthritis, bilateral knee pain, lower back pain, tobacco abuse

**(Unsigned), (undated), Tr. 261**
Assessment: left hip trochanteric bursitis, left patellofemoral osteoarthritis

**Lucas J. Pavlovich, M.D., 3/30/99, Tr. 262**
Assessment: left hip trochanteric bursitis and patellofemoral arthritis

**Lucas J. Pavlovich, M.D., 5/12/99, Tr. 263**
Assessment: patellofemoral pain

**Lucas J. Pavlovich, M.D., 11/3/99, Tr. 264**
Assessment: low back pain, possible herniated disc causing inflammation

**Lucas J. Pavlovich, M.D., 2/3/00, Tr. 266**
Assessment: deQuervain's tenosynovitis

**Physical Residual Functional Capacity Assessment, 2/9/00, Tr. 267**

Exertional limitations

        Occasionally lift and/or carry 50 pounds

        Frequently lift and/or carry 25 pounds

        Stand and/or walk for a total of about 6 hours in an 8 hour workday

        Sit for a total of about 6 hours in an 8 hour workday

        Push and/or pull: unlimited

Postural limitations

        Climbing: occasionally

        Balancing, stooping, kneeling, crouching, crawling: frequently

Manipulative limitations: none established

Visual limitations: none established

Communicative limitations: none established

Environmental limitations

        Extreme heat, extreme cold: avoid concentrated exposure

        Wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, hazards: unlimited

**M. I. McClain, M.D., 10/8/98, Tr. 280**

Impression: no evidence of malignancy seen at this time, but if any old films are available they should be obtained for comparison.

**Physical Residual Functional Capacity Assessment, 5/16/00, Tr. 289**

Exertional limitations

        Occasionally lift and/or carry 50 pounds

        Frequently lift and/or carry 25 pounds

        Stand and/or walk about 6 hours in an 8 hour workday

        Sit for a total of about 6 hours in an 8 hour workday

        Push and/or pull: unlimited

Postural limitations

        Climbing, balancing, stooping, kneeling, crouching, crawling: frequently

Manipulative limitations: none established

Visual limitations: none established

Communicative limitations: none established

Environmental limitations: none established

**Richard A. Jones, M.D., 9/18/95, Tr. 297**

Diagnosis: vaginal septum showing squamous epithelial lined fibrovascular tissues with mild squamous epithelial hyperplasia consistent with vaginal septum.

**Lucas J. Pavlovich, M.D., 6/29/00, Tr. 325**
Assessment: de Quervain's tenosynovitis

**Lucas Pavlovich, M.D., 9/18/00, Tr. 334**
Preoperative diagnosis: left forearm deQuervain's tenosynovitis
Postoperative diagnosis: same

**C. High, M.D., 10/16/00, Tr. 352**
Impression: soft tissue density or mass is seen on the scout tomogram, located in the angle
between the spleen and the left kidney.

**James V. Battisti, M.Ed., M.A., 10/6/00, Tr. 355**
Verbal IQ score: 96
Performance IQ score: 86
Full scale IQ score: 91

Diagnostic Impressions:
Axis I: pain disorder, mood disorder with depressive features, anxiety disorder with generalized
anxiety
Axis II: personality disorder NOS, schizoid personality disorder
Axis III: wrist, back, knee, hip, thyroid and abdominal problems, arthritis, bronchitis, URI,
osteoarthritis
Axis IV: medical problems, unemployed, low income
Axis V: GAF of 55

**Psychiatric Review Technique, 10/20/00, Tr. 361**
Organic mental disorders

Claimant has psychological or behavioral abnormalities associated with a dysfunction of the
brain . . . as evidenced by at least one of the following:
    Change in personality, disturbance in mood, emotional lability and impairment in
impulse control: present
    Loss of intellectual ability of at least 15 IQ points from premorbid levels or overall
impairment index clearly within the severely impaired range on neuropsychological testing:
insufficient evidence

Schizophrenic, paranoid and other psychotic disorders

Claimant has psychotic features and deterioration that are persistent, as evidenced by at least one
of the following:
    Incoherence, loosening of associations, illogical thinking, or poverty of content of speech
if associated with one of the following (in this case, inappropriate affect), emotional withdrawal
and/or isolation: present

Affective disorders

Claimant has disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following:

Depressive syndrome characterized by the following is present:
        Anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, psychomotor agitation or retardation, difficulty concerning thinking

There is insufficient evidence to determined if Claimant has manic syndrome or bipolar syndrome

Mental retardation and autism: no evidence

Anxiety related disorders

Claimant has anxiety as the predominant disturbance or anxiety experienced in attempts to master symptoms, as evidenced by the following:

Generalized persistent anxiety accompanied by:
        Motor tension, apprehensive expectation, vigilance and scanning

There is insufficient evidence to determine if Claimant has a persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity, or situation.  There is also insufficient evidence to determine if Claimant has recurrent and intrusive recollections of a traumatic experience, which are the source of marked distress.

Somatoform disorders

Claimant has physical symptoms for which there are demonstrable organic findings or known physiological mechanisms, as evidenced by the following:
        Claimant has unrealistic interpretations of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury
        Claimant has pain
        There is insufficient evidence to determine if Claimant has a history of multiple physical symptoms of several years durations beginning before age 30, that have caused her to take medicine frequently, see a physician often and alter life patterns significantly

Personality disorders

Claimant has inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress, as evidenced by the following:

Seclusiveness or autistic thinking and persistent disturbances of mood or affect

There is insufficient evidence to determine if Claimant has pathological dependence, passivity, or aggressivity

Degree of functional limitations

Restriction of activities of daily living, difficulties in maintaining social functioning: marked
Deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner: often
Episodes of deterioration or decompensation in work or work-like settings which cause the claimant to withdraw from that situation or to experience exacerbation of signs and symptoms: once or twice

**Mental Impairment Questionnaire, 4/20/00, Tr. 370**
Understanding and memory
The ability to remember work-like procedures, the ability to understand and remember very short and simple instructions: slightly limited
The ability to understand and remember detailed instructions: moderately limited

Sustained concentration and persistence
The ability to carry out very and simple instructions, the ability to carry out detailed instructions, the ability to sustain an ordinary routine without supervision, the ability to make simple work-related decisions: slightly limited
The ability to maintain attention for extended periods, the ability to maintain regular attendance and be punctual within customary tolerances, the ability to work in coordination or proximity to others without being unduly distracted by them: moderately limited
The ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: markedly limited

Social interaction
The ability to interact appropriately with the general public, the ability to ask simple questions or request assistance, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: slightly limited
The ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited
The ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes: markedly limited

Adaptation
The ability to respond appropriately to changes in a routine work setting, the ability to be aware of normal hazards and take appropriate precautions, the ability to travel in unfamiliar places or use public transportation: slightly limited
The ability to set realistic goals or more plans independently of others: moderately

limited

**Lucas Pavlovich, M.D., 9/18/00, Tr. 375**
Preoperative diagnosis: left forearm deQuervain's tenosynovitis
Postoperative diagnosis: same

**Lucas J. Pavlovich, M.D., 10/3/00, Tr. 379**
Assessment: status post de Quervain's release

**Lucas Pavlovich, M.D., 9/18/00, Tr. 380**
Preoperative diagnosis: left forearm de Quervain's tenosynovitis
Postoperative diagnosis: same

**Lucas J. Pavlovich, M.D., 9/13/00, Tr. 381**
Assessment: left wrist de Quervain tenosynovitis

**Lucas J. Pavlovich, M.D., 6/29/00, Tr. 382**
Assessment: de Quervain's tenosynovitis

**(Illegible), (Illegible), Tr. 402**
Impression: right upper lobe infiltrate, compatible with pneumonia

**Dwight D. Im, M.D., 10/26/95, Tr. 422**
Impression: incapacitating chronic pelvic pain, unresponsive to medical therapy and previous
surgical interventions

**W. David McNeely, M.D., 11/11/95, Tr. 428**
Indication: cough

**Dwight D. Im, M.D., 1/25/96, Tr. 438**
Admission diagnosis: chronic pelvic pain, didelphic uterus, abnormal endometrium
Discharge diagnosis: same

**Morgan D. Morgan, M.A., 1/9/01, Tr. 447**
Diagnostic impressions:
Axis I: depressive disorder, NOS, pain disorder, associated with both psychological factors and a
general medical condition
Axis II: schizoid personality features
Axis III: reported arthritis, bursitis, stomach pain, hypothyroidism
Prognosis: fair-guarded

**Medical Assessment of Ability to Do Work-Related Activities (Mental), 1/9/01, Tr. 453**
Making occupational adjustments
      Function independently: good

Follow work rules, use judgment, interact with supervisors, maintain attention/concentration: fair

Relate to co-workers, deal with the public, deal with work stresses: poor

Making performance adjustments

Understand, remember and carry out simple jobs instructions: unlimited

Understand, remember and carry out detailed, but not complex job instructions: good

Understand, remember and carry out complex job instructions: fair

Making personal-social adjustments

Maintaining personal appearance: good

Behave in an emotionally stable manner, relate predictably in social situations, demonstrates reliability: fair

**Joseph Noronha, M.D., 12/12/00, Tr. 458**

Diagnosis: (before): prior colonic polyps, abdominal pain, blood in stool

(after): very ill prepped bowel, unsatisfactory scoping for small polyps in the cecum removed but not retrieved

**Arturo Sabio, M.D., 1/25/01, Tr. 459**

Impression: degenerative arthritis of the spine, posttraumatic degenerative arthritis of the left knee, hypothyroidism, nonsteroidal antiinflammatory drug-induced gastritis, gastroesophageal reflux disease, moderate obesity

**Medical Assessment of Ability to Do Work-Related Activities, 1/18/01, Tr. 466**

Are lifting/carrying affected by impairment: yes

How many pounds can the individual lift/carry:

Maximum occasionally: 20 pounds

Maximum frequently: 10 pounds

Are standing/walking affected by impairment: yes

How many hours in an 8 hour workday can the individual stand and/or walk: 4 hours. Without interruption: 15 minutes

Is sitting affected by this impairment: yes

How many hours in an 8 hour work day can the individual sit total: 4 hours. Without interruption: 20 minutes

How often can the individual perform the following postural activities?

Balance: frequently

Stoop, crouch, crawl: occasionally

Climb, kneel: never

Are the following physical functions affected by the impairment?

Pushing/pulling: yes
Reaching, handling, feeling, seeing, hearing, speaking: no

Are there environmental restrictions caused by these impairments?
Heights, moving machinery, temperature extremes: yes
Chemicals, dust, noise, fumes, humidity, vibration: no

**Eli Rubenstein, M.D., 1/23/01, Tr. 469**
Impression: moderate degenerative changes of the knee joint

**C. High, M.D., 10/16/00, Tr. 470**
Impression: soft tissue density or mass is seen on the scout tomogram, located in the angle between the spleen and the left kidney; its exact nature is not clear. Right flank pain and hematuria have not been explained.

**Lucas J. Pavlovich, M.D., 6/18/01, Tr. 475**
Preoperative diagnosis: left knee internal derangement
Postoperative diagnosis: left knee degenerative medical compartment with femoral condyle condylar flap.

**Lucas J. Pavlovich, M.D., 10/17/02, Tr. 487**
Assessment: carpal tunnel release

**Lucas J. Pavlovich, M.D., 8/29/02, Tr. 488**
Preoperative diagnosis: left carpal tunnel syndrome
Postoperative diagnosis: same

**Lucas J. Pavlovich, M.D., 8/21/02, Tr. 489**
Assessment: left carpal tunnel syndrome, status post tibial spine fracture

**Lucas J. Pavlovich, M.D., 7/18/02, Tr. 490**
Assessment: tibial spine avulsion fracture

**Lucas J. Pavlovich, M.D., 6/27/02, Tr. 491**
Assessment: internal derangement with possible tibial avulsion fracture

**Lucas J. Pavlovich, M.D., 6/12/02, Tr. 492**
Assessment: status post carpal tunnel release

**Lucas J. Pavlovich, M.D., 4/3/02, Tr. 493**
Assessment: internal derangement, left knee

**Lucas J. Pavlovich, M.D., 3/20/02, Tr. 494**
Assessment: internal derangement of the left knee

**Lucas J. Pavlovich, M.D., 1/3/02, Tr. 495**
Assessment: bilateral carpal tunnel syndrome

**Lucas J. Pavlovich, M.D., 12/6/01, Tr. 496**
Assessment: bilateral wrist carpal tunnel syndrome

**Lucas J. Pavlovich, M.D., 11/8/01, Tr. 497**
Assessment: patellofemoral instability

**Lucas J. Pavlovich, M.D., 10/9/01, Tr. 498**
Assessment: patellofemoral instability

**Lucas J. Pavlovich, M.D., 9/6/01, Tr. 499**
Assessment: patellofemoral instability

**Lucas J. Pavlovich, M.D., 8/22/01, Tr. 500**
Assessment: status post rhomboid strain

**Lucas J. Pavlovich, M.D., 7/3/01, Tr. 502**
Assessment: status post knee arthroscopy

**Lucas J. Pavlovich, M.D., 6/13/01, Tr. 503**
Assessment: inflammatory condition with internal derangement

**Lucas J. Pavlovich, M.D., 5/9/01, Tr. 504**
Assessment: status post internal derangement of the knee

**Lucas J. Pavlovich, M.D., 4/26/01, Tr. 506**
Assessment: internal derangement of both knees

**Lucas J. Pavlovich, M.D., 3/27/01, Tr. 509**
Assessment: bilateral knee internal derangement with osteoarthritis of the patellofemoral joint

**Lucas J. Pavlovich, M.D., 12/5/00, Tr. 510**
Assessment: internal derangement of both knees with patellofemoral arthritis – left greater than right

**Lucas J. Pavlovich, M.D., 11/7/00, Tr. 511**
Assessment: status post de Quervain's tenosynovitis release

**Jo Ann Hornsby, M.D., 12/10/02, Tr. 520**
Impression: increased radiotracer uptake in the proximal wrists, hands, and feet. Findings are compatible with rheumatoid arthritis.

**Jo Ann Hornsby, M.D., 11/14/02, Tr. 522**
Assessment: there is diffuse muscle and joint pain and fatigue. The patient appears to have some chondrocalinosis in the knee. There is a finding of fibromyalgia.

**Frederick R. Lemley, M.D., 2/6/02, Tr. 530**
Assessment: there is a likely diagnosis of chondromalacia of the patella

**Andrew Mace, M.D., 2/8/02, Tr. 532**
Impression: mild degenerative changes noted about left knee, slight left knee chondrocalcinosis

**Arturo Sabio, M.D., 3/25/04, Tr. 556**
Diagnostic impression: chronic back strain, degenerative arthritis of the spine and knees, morbid obesity, hypothyroidism, history of gastroesophageal reflux disease

**Medical Source Statement of Ability to Do Work-Related Activities (Physical), 4/6/04, Tr. 561**
Exertional limitations
    Occasionally lift and/or carry 20 pounds
    Frequently lift and/or carry 10 pounds
    Are standing and walking affected by the impairment: yes. Stand and/or walk about 6 hours in an 8 hour work day
    Is sitting affected by the impairment: no
    Is pushing and/or pulling affected by the impairment: yes. Limited in upper and lower extremities

Postural limitations
    Balancing, kneeling, stooping: occasionally
    Climbing, crouching, crawling: never

Manipulative limitations
    Fingering, feeling: unlimited
    Reaching in all directions, handling: limited
        Reaching, handling: occasionally
        Fingering, feeling: constantly

Visual/communicative limitations
    Seeing, hearing, speaking: unlimited

Environmental limitations
    Temperature extremes, noise, dust, vibration, humidity/wetness, hazards, fumes, odors, chemicals, gases: unlimited

**Sharon Joseph, Ph.D., 3/15/04, Tr. 566**
Intellectual assessment:

Verbal IQ: 97
Performance IQ: 89
Full scale IQ: 94

Diagnostic impression:
Axis I: pain disorder with both psychological and physiological components, depressive disorder NOS
Axis II: R/O somatoform disorder
Axis III: fibromyalgia, rheumatoid arthritis, hypercholesterolemia, hypothyroidism, carpal tunnel syndrome, osteoarthritis, per report

Prognosis: psychological prognosis is considered to be fair with treatment for depressive symptoms and pain management

**Medical Source Statement of Ability to Do Work-Related Activities (Mental), 4/5/04, Tr. 572**
Is the ability to understand, remember, and carry out instructions affected by the impairment: yes. The restrictions the Claimant has are:
      Understand and remember short, simple instructions, the ability to make judgments on simple work-related decisions: none
      Carry out short, simple instructions, understand and remember detailed instructions, carry out detailed instructions: slight

Is the ability to respond appropriately to supervision, co-workers, and work pressures in a work setting affected by the impairment: yes. The restrictions the Claimant has are:
      Interact appropriately with the public, interact appropriately with supervisors, interact appropriately with co-workers: slight
      Respond appropriately to work pressures in a usual work setting, respond appropriately to changes in a routine work setting: moderate

**Lucas J. Pavlovich, M.D., 4/6/04, Tr. 577**
Assessment: patellofemoral instability as well as patellofemoral arthritis

**Christian Butcher, M.D, 6/17/04, Tr. 578**
Assessment: possible obstructive sleep apnea, depression related to sleep disturbance, poor sleep hygiene

**Jo Ann Hornsby, M.D., 11/18/03, Tr. 588**
The patient has active fibromyalgia. She has chondrocalcinosis and possible rheumatoid arthritis.

**Thuan-Phoung Nguyen, M.D., 11/18/03, Tr. 592**
Indication: pain

**Thuan-Phoung Nguyen, M.D., 11/18/03, Tr. 593**
Indication: joint pain


**S. Cormier, M.D., 6/16/04, Tr. 611**
Impression: stable benign findings


**Davis Memorial Hospital, 4/28/04, Tr. 612**
Diagnosis: negative for intraepithelial lesion and malignancy


**Davis Memorial Hospital, 4/30/04, Tr. 614**
Diagnosis: no endocervical cells are present.  This is consistent with a history of hysterectomy.


**Michael D. Morello, M.S., 6/29/04, Tr. 622**
Verbal IQ: 91
Performance IQ: 90
Full scale IQ: 90

Diagnostic impression:
Axis I: depression disorder NOS, anxiety disorder NOS with social phobic features
Axis II: deferred
Axis III: arthritis, fibromyalgia, possibly sleep apnea
Axis IV: economic problem–low income, vocational problem–unemployed
Avis V: 55


**Psychiatric Review Technique, 7/13/04, Tr. 629**
The Claimant has disturbance in mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following:
        Depressive syndrome characterized by at least four of the following:
                Anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, decreased energy

Degree of functional limitations
        Restriction of activities of daily living, difficulties in maintaining social functioning: moderate
        Difficulties in maintaining concentration, persistence, or pace: mild
        Episodes of decompensation, each of extended duration: none


**Mental Residual Functional Capacity Assessment of Work-Related Abilities, 7/13/04, Tr. 643**
Limitations in understanding, remembering, and carrying out instructions
        Understand and remember short, simple instructions, carry out short, simple instructions, understand and remember detailed instructions, carry out detailed instructions, exercise judgment or make simple work related decisions: slight

Limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines

        Sustaining attention and concentration for extended periods: slight

        Maintaining regular attendance and punctuality, completing a normal work day and work week without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks: moderate

Limitations in social functioning in a normal competitive work environment

        Interacting appropriately with the public, working in coordination with others without being unduly distracted by them, maintaining acceptable standards of grooming and hygiene, maintaining acceptable standards of courtesy and behavior, demonstrating reliability, the ability to ask simple questions or request assistance from co-workers or supervisors: moderate

        Responding appropriately to direction and criticism from supervisors, relating predictably in social situations in the workplace without exhibiting behavioral extremes: marked

Adaptation in work setting

        The ability to respond to changes in the work setting or work processes: moderate

        The ability to be aware of normal hazards and take appropriate precautions: slight

Functioning independently in a competitive work setting

        Carrying out an ordinary work routine without special supervision, traveling independently in unfamiliar places: slight

        Setting realistic goals and making plans independently of others: marked

Limitations in work adjustment

        The ability to tolerate ordinary work stress: marked

**John A. Young, M.D., 7/7/04, Tr. 649**

A polysomnographic study failed to show a significant problem with sleep disordered breathing. Claimant does have significantly elevated limb movement, which suggests a sleep disorder.

**WVU Department of Medicine, 6/21/04, Tr. 667**

Assessment: possible obstructive sleep apnea, depression related sleep disturbance, poor sleep hygiene

**Ronald Mudry, M.D., 11/19/04, Tr. 679**

Assessment: periodic limb movements in sleep

D.      <u>Testimonial Evidence</u>

Testimony was taken at the first hearing before an ALJ, which occurred on December 6,

2000. The following portions of the testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]

Q      And then you - - what happened, you know, after that you, you know, you're not working now?  What kind of problems do you have that might keep you from working?

A      I have trouble sitting for long periods of time.

Q      Yeah.

A      And I have trouble holding onto things since he did the surgery on my left hand.

Q      And you had the - -

A      The tendons released.

Q      Yeah.

A      I drop things very easily.

                    *                    *                    *

Q      So your, you can't use your - - well, what hand is it, it's your - -

A      My left hand.

Q      Left hand.  And are your right-handed or left handed?

A      I'm right-handed.

Q      And is the right hand okay?

A      Yes.

                    *                    *                    *

Q      Yeah.  As far as a typical day could you tell me like you do anything special on most days or you have a set kind of routine?

A      Pretty much a set kind of routine.

Q      What kind of things do you do, like what time do you get up?

A       I'm usually up between 8:00 and 8:30.

Q       And are you able to feed and dress yourself [INAUDIBLE]?

A       Yes, I do have trouble tying shoes - -

Q       Yeah.

A       - - and bending over to do it.

Q       Now do you help [INAUDIBLE] around the house [INAUDIBLE]?

A       Yes, I do.  I do dishes.

Q       Yeah.

A       I have to stop about every five to ten minutes to sit down to do them - -

Q       And you've been - -

A       - - because my legs give out.

Q       - - you've been having problems holding onto dishes too or - -

A       Um-hum.

Q       - - [INAUDIBLE]

A       She's, my mother has stopped me the last couple of weeks from washing dishes.

                              *               *                    *

Q       Now do you ever get outside the house?

A       Yes, I do.

Q       Okay.  What kind of things, do you go like grocery shopping or [INAUDIBLE]?

A       I don't go grocery shopping.

Q       Yeah.

A       I'm not a - - I don't like to go shopping - -

Q       Do you have - -

A       - - [INAUDIBLE] - -

Q       - - people you like to visit or - -

A       I visit with my aunt.

Q       Uh-huh.

A       I go to church occasionally.

Q       Yeah.  And what about doctor appointments, you keep your doctor appointments and all that?

A       Yes, sir.

Q       Now do you drive?

A       Yes.

Q       And you have any problems driving?

A       Other than that when it's dark, I have night blindness.

Q       Oh, yeah, I note - -

A       [INAUDIBLE] dark - -

Q       - - you're wearing glasses.  Do the lights from the cars shining kind of bother you?

A       Yeah, they blind me totally when they hit me after dark.

Q       Yeah, I hate driving after dark myself.  Now do you have anything you like to do that, you know, that, you know, like watch TV or, you know, is there any hobbies you might, you know, divert yourself with?

A       I watch some TV but I can't stand to sit there for long periods of time.  I'm

usually up and down.

Q        Um-hum.

A        I read.  I use to do needlepoint but I have trouble with the hands and the needles --

*                *                *

[EXAMINATION OF CLAIMANT BY HER ATTORNEY]

Q        Just to resume what you were telling us, about how long can you sit before you

need to get up and move around?

A        Anywhere from 10 minutes to [INAUDIBLE] at the most.

*                *                *

Q        Now as far as driving, are you limited in any way in how far you can drive?

A        To go to doctor's appointment in Elkins and it's roughly 62 miles I have to stop

two and sometimes three times on the way there.

Q        Do you have any difficulty with your knees or your ankles or your feet?

A        [INAUDIBLE] it locks if I stand too long or I sit too long.

*                *                *

Q        Okay.  Approximately how long can you stand before you need to sit down?

A        Ten minutes is the most I can stand.

Q        What happens if you stand longer than that?

A        My legs go numb.

Q        Now you've told us about the thighs going numb.

A        Um-hum.

Q        Does the numbness ever go further down your leg than that or is this the

numbness that you're talking in your thighs?

A      If I stand for more than ten minutes it goes all the way to my ankles.

Q      What about climbing stairs, do you have any difficulty either - -

A      I don't do stairs at all.

Q      Well, you get in and out of a car so that's one step.  How many steps do you think you could go, for instance, getting into your house, do you have any steps?

A      We have three steps in the front door and five in the back.

Q      Okay.  Do you have any difficulty either going up or down those stairs?

A      The back steps I have trouble going up them.

Q      Is that because of your knees, your back or - -

A      Both.

Q      What about kneeling down or crawling, would you - -

A      I don't - -

Q      - - have any difficulty doing that?

A      - - I don't crawl, I can't get down far enough to crawl.

Q      Okay, so you just couldn't do that?

A      [INAUDIBLE]

Q      What about just bending over from the waist, do you have any difficulty if you're just bending over?

A      Yes.

Q      You mentioned something about your shoes.  Tell me a little bit about that.

A      I can't bend over far enough to tie shoes so my mother ties my shoes most of the

time.

Q      What about just - - what about not bending that far over but just, you know, bending over maybe putting your hands on your knees or something like that, can you do that all right without - -

A      Not [INAUDIBLE].

Q      So you bend better if you're sitting?

A      I bend better if I'm sitting.

Q      What about squatting, any trouble squatting down?

A      I can't squat, it hurts my hips to squat.

                    *                    *                    *

Q      - - did that?  What about lifting and carrying, what is it about - - what is the amount of weight that you would feel reasonably comfortable lifting fairly off and on during the day?  Think about what you do at home or whatever.

A      Maybe five, ten pounds [INAUDIBLE].

Q      What happens if you lift too much?

A      My back goes totally out.  It doesn't just spasm, it goes totally out.

Q      In other words, you experience some pretty bad pain?

A      Yes.

Q      What about walking, if you're setting out on level ground and you're not trying to hurry, about how far could you walk or how long before you'd need to stop and rest, get off your feet?

A      Maybe 10, 15 minutes and then I've got to stop.

Q       Do you do much walking for exercise or anything else?

A       I walk, my aunt lives on the same road we live on - -

Q       Uh-huh.

A       - - I walk to her house.

Q       Okay.

A       And she's [INAUDIBLE] down from us.

Q       Okay.  So you can walk there and back without any trouble?

A       I go there stop at her house.  I can't - -

Q       Okay.

A       - - go there and come back.

Q       Okay.  When you stop what is it that causes you to have to stop?

A       Pain in my hips and my legs.

Q       Okay.  Do you use any kind of cane or anything to assist you?

A       No.  I do have knee braces.

Q       And when you say you have them do you actually use them or just - -

A       Yes.

                          *               *               *

Q       Okay.  Let's see, I've asked about you about your low back and your legs and your feet.  Let me ask you a little bit about the left hand that you had the surgery on.  Now I believe you indicated that initially you had some good results from that.

A       Yes.

Q       And you're having trouble with it now?

A       Um-hum.

Q       What kind of trouble do you have other than I think you said you drop things?

A       I can't hold onto anything for a very long period of time because my [INAUDIBLE] giving away.

Q       Okay, so you have a feeling of kind of weakness - -

A       Yes.

Q       - - in the wrist?  What if this is something small, does it have anything to do with the weight of it or is it the act of grasping?  What seems to be the difficulty?

A       (No audible response.)

Q       Do you understand why I'm - -

A       Yeah, I think maybe a combination of the two because if I lift anything like a glass [INAUDIBLE] - -

Q       Um-hum.

A       - - juice or something my wrist tends to go down.

Q       Um-hum.

A       But even with nothing in that glass it just kind of like it doesn't want to - - it's not that I can't grasp it - -

Q       Um-hum.

A       - - it's just that I - - the nerves and stuff in there in my thumb - -

Q       Um-hum.

A       - - [INAUDIBLE] my thumb lets go.

Q       Okay, so it lets go without you realizing that it's going to do that?

A Um-hum.

Q And you feel that it's mostly the thumb that's - -

A Yeah - -

*   *   *

Q Um-hum, all right.  How much use do you have of the left hand?  Let's say, do you ever do something like peel potatoes or something like that?

A No.

Q Don't do any cooking?

A I do cooking but [INAUDIBLE] potatoes or anything like that.

Q Well, let's say you needed to, would you have any difficulty peeling potatoes with your hands or is that something you could accomplish without too much difficulty?

A [INAUDIBLE] for sure but I might be able to do it.

Q How many do you think you could do [INAUDIBLE]?

A Maybe three or four.

Q What would happen after three or four or why do you think you couldn't do any more than that?

A When I try to hold my hand this way - -

Q Um-hum.

A - - after a while I get pains that shoot through this far where he did the surgery.

Q All right.  What about something like typing would - - have you tried to do any typing or do you know how the left hand would respond to something like typing?

A I haven't tried that.

Q       Do you have any idea of how your hand would be affected if you tried to do some typing?

A       I don't know that it would bother my fingers.  I don't think it would probably after a while make my wrist start to hurt.

*                    *                    *

Q       We didn't quite finish letting you tell us what you did in a normal day and I think we got maybe as far as breakfast and getting dressed.  And you told us you were having some trouble with your shoes.  Just, in a general fashion, tell me what you do in a normal day.

A       My mother and I we take turns doing the breakfast dishes.  If she did the breakfast dishes, I'll do the dinner dishes or vice versa.

Q       Okay.  Well, tell me what would be usual, say, between 8:30?  Do you eat lunch at noon?

A       No, I don't eat lunch.

Q       No lunch.  What do you do between the time you get up in the morning and have breakfast and you all, whichever does the dishes, what do you normally do in the mornings?

A       Make my bed and straighten my room up.

Q       Okay.  Do you watch television or read or listen to music or - -

A       I - -

Q       - - anything like that?

A       - - read my Bible for about an hour maybe.

Q       Is that in the morning?

A       Yes.

Q      Are there any household chores or errands or anything like that, that have to be done that you have to do?

A      [INAUDIBLE].  In the afternoon we take turns cooking dinner.  And once a week we vacuum and dust.

Q      When you say we, who is that?

A      My mother - -

Q      Do you have any difficulty doing that?

A      She does the vacuuming and she dusts the things that down really low.

Q      Okay.

A      I just basically dust the top of the TV, tops of dressers [INAUDIBLE].

Q      Things that you don't have to bend down to reach?

A      Yeah.

Q      Okay.  In terms of sitting, standing, walking, and so forth how - - tell me about your positions during the day.  How much sitting you do, how much standing, walking?  Do you do any lying down or reclining, resting?

A      At the most maybe three hours in a day sitting.

Q      Okay.  That's all together?

A      I'm up constantly moving walking.

Q      Up and down?

A      Yeah.

Q      Okay.  Let's focus on the hours between 9:00 and 5:00,  9:00 in the morning and 5:00 in the afternoon.  Now the three hours of sitting would that be included in that time period

or are you talking about from the time you wake up in the morning until the time you go to bed?

A        No, it's [INAUDIBLE].  The sitting, the three hours would probably be just in the evening, in the afternoon, in the evening.

Q        Okay.  So from - - you're sitting three hours from noon until when?

A        Until I go to bed.

Q        Until you go to bed, okay.  What else are you doing?  How much standing do you do approximately?  I know you probably don't measure this.

A        Two, three hours.

Q        Okay, a little bit less than the amount of sitting?

A        Yes.

Q        Okay.  How about walking?

A        I walk in circles around a lot in the house.

Q        Okay.  Is that in addition to the standing or is that two or three hours standing and walking being up on your feet?

A        Well, that's with walking around the house [INAUDIBLE] two or three hours [INAUDIBLE] trying to do the dishes [INAUDIBLE].

Q        Okay, so that's intermittently then?

A        Yeah.

Q        Okay.  Do you do any lying down or reclining?

A        Yes, I sit in a recliner chair so I can tip it back far enough that it takes the pressure off of my lower back and off of my hips.

Q        Now is this different from the sitting that you told us before?

A Yes, that three hours maybe on the sofa - -

Q Okay.

A - - at the kitchen chair.

Q Okay.  How much time do you think you're spending in the recliner tipped back?

A Probably about three hours [INAUDIBLE]

Q Now you're varying your positions about how often?

A Constantly.

Q Well, every how many minutes approximately or hours?

A Every 10 to 15 minutes.

Q And you're doing that why?

A To take the pressure off my hips and back.

*   *   *

Q Do you have any difficulty sleeping?

A Yes.

Q Do you know why?

A No.

Q How many hours a sleep at night do you think you get not counting rest, I mean not counting waking up, in other words, how many good hours of rest do you think you get?

A Maybe four hours.

Q Do you have bad drams or - -

A Well, I - -

Q - - pains or - -

A - - have pain [INAUDIBLE]

Q Just can't sleep?

A Just can't sleep.

Q Do you do any sleeping in the daytime?

A No.

Q Do you ever try to ?

A I've tried but I can't - -

Q Just can't seem - -

A [INAUDIBLE] - -

Q - - to do it?  What about your energy level, how do you feel in the daytime?

A Tired  [INAUDIBLE].

*   *   *

Q Have you noticed whether or not, other than what you've told us about, whether you have any discomfort being around people in either your family or your neighbors, relatives, or anything like that?

A [INAUDIBLE] a lot of problems being around groups of people.

Q When you say a lot of problems what kind of problems do you have being around groups?

A I get anxious and very nervous to the point where I'm shaking.

Q Now is - - what kind of a group is this, in other words, are you talking about a store or church or club or anything?

A Church, it makes me nervous to go into church.  And I generally don't go

shopping because I get very nervous and edgy and - -

Q    Is it just the people or do you know?

A    I don't what it is.

Q    When you go to church are you with people you know?

A    I know a lot of them.

Q    Do you - -

A    It still makes me nervous to be around them.

Q    How do you handle that?

A    I get very quiet and I don't talk.

Q    What about participating like in church groups?

A    I don't.

Q    You don't.  Is this something new for you?

A    No, I've always been like that.

*          *          *

Q    What about concentrating, do you have any difficulty concentrating such as TV programs, books, reading the Bible, whatever?

A    Yeah, I do in reading.  I tend to read the same page four or five times before I go on.

Q    Do you seek the company of other people such as picking up the telephone and calling somebody or going to visit someone?

A    Generally, no, I don't answer the phone unless there's nobody at home.

Q    You say that as if it's intentional.

A       It is.

Q       You deliberately don't answer - -

A        I don't answer the phone.

Q       Why is that?

A       I just don't answer it, I don't know.

                    *               *               *

Q       Now when you say sick headaches what do you mean by sick headaches?

A       I get nauseous, I have vomited, can't stand bright lights. [INAUDIBLE]

Q       And how long do they last?

A       Anywhere from two to twelve hours.

Q       Is there any thing you can do for them?

A       No.  I've taken Imitrex and some other drugs for migraines but they don't help.

Q       What do you do when you have the headaches?

A       Lay down in a dark room.

Q       How long has that been going on?

A       I've had headaches since I was probably 19 years old.

Q       Have they gotten any better or gotten any worse?

A       They're getting worse.  The older I get the worse they get.

Q       More frequently or more severe?

A       More frequently and more severe.

                    *               *               *

Q       Okay.  Now you indicated when you got nervous you shook.

A       Um-hum.

Q       Is - - how long does something like that happen to you?

A       In large groups of people it happens a lot.

Q       So - -

A       Like when I go to church I usually sit on my hands so they stop shaking.

                        *              *              *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q       Okay.  If we have a hypothetical individual who's a younger individual with a high school education, prior work history similar to that of the claimant.  And this hypothetical individual has all the symptoms and limitations that the claimant stated here today that she had would there be any jobs you could identify that such a hypothetical individual might be able to do?

A       No, Your Honor.

Q       Why not?

A       The testimony I heard would be that she would be - - have headaches and have to lie down two to twelve hours at a time.  Had difficulty concentrating.  Had to go to the bathroom seven times a day.  Had to sit in a recliner.  With these types of conditions it would be difficult to offer substantial gainful employment in competitive work.

Q       Could she - -

A       She couldn't, most important wouldn't permit a person to sit in a recliner or lie down.  Also if she was off task because of the headaches and had to withdraw from the work setting this could eliminate her from competitive employment.

Q       And changing the hypothetical, let's say we had a hypothetical individual who might be capable of sedentary exertion with the same vocational profile as the claimant. And this hypothetical individual would have problems with doing any really complex stressful type tasks. That she could do simple routine tasks that didn't involve a lot of stress in say terms of productivity or public contact or, you know, that where it would be simple routine and didn't involve any, you know, changes, you know, it'd be kind of familiar so there wouldn't be any new things that she'd have to learn this hypothetical individual might be able to do. And then putting in a requirement of say the dominant hand is all right but there's impaired manipulation on the left non-dominant hand. She couldn't use that for sustained manipulation but, you know, could do that occasionally or frequently but just couldn't you know, keep on going with the left non-dominant hand. With these kind of limitations would there be any jobs you can think of that hypothetical individual might be able to do?

A       With the limitations as described, Your Honor, there would be simple and routine jobs that would not involve public contact, would have few changes, and would not be fast paced quota jobs, and ones that could be done with the use of the dominant with occasional help from the other hand. Some examples would be that of a surveillance system monitors. There are 40 in the local labor market, 15,000 nation. There are administrative support occupations such as addressers, 145 local, 100,000 nation. There are laundry pricing clerks, 30 local, 15,000 nation. There are sorters and graders of small products, 50 local, 20,000 nation. These would be some examples, Your Honor, at the sedentary level of functioning.

                        *               *               *

[EXAMINATION OF VOCATIONAL EXPERT BY CLAIMANT'S ATTORNEY]

Q      Okay.  If I changed that hypothetical just a little bit and say that this lady should avoid jobs where the use of that left hand is an important part of the job [INAUDIBLE].  I don't know if that's going to make any difference or not but it just sounded to me as though, at least the sorters and graders - -

A      The sorters and graders of the four jobs I mentioned would probably be affected most by your additional hypothetical.

Q      Okay.

A      Yes, these are small products which assuming a person had no impairments on the dominant hand.

Q      Okay.

A      These are small products and there's not a lot of manipulation.  You pick things up to see if they're the same size, see if there's anything that has to be put aside.  But for the most part you can do it one-handed if there's no impairments to the right hand.

Q      Okay.

A      You would - -

Q      Okay.

A      - - need occasional support from your other hand.

Q      All right.  If we ask you to assume that this lady was going to need unscheduled breaks in excess of the normal breaks such as morning, afternoon, and lunch for a variety of reasons.
But that more than half of the time she was going to need to take unscheduled breaks what impact would that have on these jobs?

A          With the sorting and grading there would be little tolerance for that.  This is work that is - - you have to maintain your pace, persistence and the job task within the schedule.  The surveillance system monitor also you have to maintain your work station.  So this would affect both of those jobs.  The administrative support occupation, the addresser, and the laundry pricing clerk there's more flexibility involved there.  Typically there's three breaks during the day, half hour for lunch, two fifteen minute breaks.  But in those two last jobs you could probably, as long as you were being productive 90% of the time while you were on the job - -

Q          Um-hum.

A          - - you could take one or two extra breaks to run to the bathroom if it was not being excessively long, five, maybe six, eight minutes.

Q          Okay.  So I guess from your answer then if her beaks were - - needed to be longer for such things as headaches or crying spells or - -

A          Sure, if she was off task more than - - I mean if she had to run - - get away, withdraw from the work process for longer than five or ten minutes more than once or twice in addition to regular breaks this would preclude her from these jobs.

Q          Okay.  Let me see if there was anything else.   Now when you say administrative support, is that person working for some, or under the supervision of someone?  How - -

A          It's a support job that supports the regular clerical task.  It does the simple route things.

Q          Okay.

A          There's a specific job I'm referring to here.  The census code is administrative support.  The specific DOT is addresser which is - -

Q       Okay.

A       - - just simple and routine of the administrative support which reflects the

numbers I gave.

Q       An addresser is like writing numbers or - -

A       Just writing - -

Q       - - I mean - -

A       - - address - -

Q       - - writing envelopes?

A       - - just addressing envelopes - -

Q       Okay.

A       - - manually.

Q       How about this laundry pricing clerk, what does that involve?

A       Basically, you would just be pricing laundry.  It's three suits or [INAUDIBLE] - -

Q       Okay.

A       - - or something like that.

Q       Okay.

A       A coat would be - -

Q       Writing - -

A       - - [INAUDIBLE] - -

Q       - - writing tickets?

A       Writing tickets and - -

Q       I see.

A        - - putting them on the laundry.

Q        I see, okay.  Let me see if there's anything else.  Do any of these jobs require understanding and remembering detailed instructions or is that taken care of by the Judge's use of the word simple?

A        These, in my estimation, are not complex jobs.  They're simple and routine job where you can learn in less than 30 days and there are not regular changes.  you do the same thing basically everyday.

Q        Okay.  Are any of these jobs involving close quarters with co-workers?

A        There would be co-workers in the sorting and grading position and the addresser position.  But there would not be - - they would be at least 15 feet away from - -

Q        Okay.

A        There would be people around you.

Q        Okay.

A        Depending on the makeup of the office.  Sometimes you could be completely by yourself or - -

Q        Okay.

A        - - removed.  The, you know, as the laundry pricing clerk basically you're working in a small organization where there's other people that are doing the actual laundering and you're in the office area.  So there would be other people around you, in answer to your question, but you would not have a lot of interaction.

Q        This person that's writing the tickets that person doesn't come in contact with the public?

A        No.

Q        Okay.

A        This is, no, this is not - -

Q        just like in the  - -

A        - - public contact - -

Q        - - back room - -

A        Yes - -

Q        - - or somewhere?

A        - - yes.

Q        Okay.

A        She's not a counter clerk, no.

Q        Okay.  All right.  And I think your answer to the credibility question that the Judge gave you was primarily directed towards the breaks from the work that would be required if you assumed headaches and having to lie down during the day and bathroom breaks, things like that.  That was the primary reason that you felt she couldn't work under the Judge's first hypothetical?

A        Yes.

Testimony was also taken at the second hearing before an ALJ, which occurred on August 19, 2004.  The following portions of testimony are relevant.

[EXAMINATION OF CLAIMANT BY ALJ]

Q        About how tall are you?

A        5'3".

Q       About how much do you weigh?

A       236.

                    *               *               *

Q       How did you get here today?

A       I drove myself.

Q       And about how long a drive was it?

A       I left at 7:30 and I got here at 10:30.

Q       So it was about a three hour drive?

A       I stopped three times.

Q       And why did you stop?

A       I have trouble sitting for long periods of time in a car.

Q       So you just stopped and got out of the car and walked around for a few minutes or

-       A       Yes.

Q       And you came by yourself?

A       Yes, I did.

                    *               *               *

A       I'm usually up between 8:30 and 9:00.  I shower, have breakfast.  I might wash

dishes or run the vacuum.  I help with the laundry.  We don't do laundry everyday.  We do it a

couple times a week.

Q       When you say you help, you help your mom with the laundry or - -

A       Yes.

Q       And that just basically requires picking up the dirty clothes and putting them in

the washer and taking them out and putting them in the dryer.  Or do you hang up the clothes?

A       No, we don't hang them up.  They go in the washer and dryer.

Q       Do you iron?

A       No.

Q       Do you watch television or read?

A       I read quite a bit.

Q       What kind of things do you read?

A       Mysteries.

Q       How about, you know, in the afternoon do you have things you do in the afternoon once you've, say, done the work around the house?

A       I watch some TV, not much.

Q       Do you go out shopping with your mom?

A       Not very often.

Q       Well, how do you get the groceries?

A       She usually takes care of that.

Q       And you don't go with her?

A       No.

Q       Do you have neighbors that you talk with or see during the day?

A       Yes, I have an aunt that lives three houses down.

Q       And do you go over to there to check on her or talk with her or does she come over to your place?

A       Both, we go to each others.

Q      Do you have other things you do, you know, do you have hobbies, read, besides reading, do you sew or crochet or knit or - -

A      I use to my hands cramp, start to cramp and I can't hold the needles anymore.

Q      And how long has that been that your hands kept you, the cramping in your hands have kept you from holding your needles?

A      Probably for the last four years.

Q      Do you have friends that you do things with that you see during the day or in the evenings?

A      I have friends at church that we do different things with.

Q      And like they're social activities in connection with church?

A      Yes.

Q      And how often do you go to church?

A      Twice a week, Sunday and Wednesday.

Q      How long is the service?

A      Usually an hour.

Q      Are you able to sit or stand or kneel as the service would dictate?

A      I sit but I do a lot of fidgeting.

Q      And then you talk with people after the service or before the service?

A      Yes.

Q      You have a - - sometimes they have like a social like coffee and donuts or deals or social activities.

A      We do but they're holidays mostly.

Q    Mostly.  Do you talk with your brothers and sisters occasionally or see them?

A    I see them more during the summer.  The - - we usually talk to them once a week.

Q    Do they come down to visit during the summer or do you go visit them or - -

A    They come down here a lot more then we go up there.

Q    And do you have any - - you said you had some problems sleeping or - -

A    Yes.

Q    And what problems do you have?

A    I have a disorder called restless leg syndrome and - -

Q    What's that?

A    I can explain it the way the doctor explained it to one of his residents last week when I saw him.

Q    Okay.

A    He said to me - - he asked me could I still for an hour if he gave me a million dollars and I said no.  And he asked me to explain what would happen if I tried to sit still for that hour.  The thighs of my legs go numb.  My feet start to tingle like they're asleep.  And from my knees to my ankles it feels like I have bugs crawling up my legs.

Q    Now is that something that just bothers you when you sit down?

A    No, it bothers me at night and when I lay down.  that's why they call it a sleep apenea because my legs start to jerk at night when I sleep so I'm coming awake five - - he didn't say exactly how many times I'm actually waking up from it but I wake up totally awake from it.

Q    So what do you do when you wake up, totally awake from it?

A    I usually have to get up and move around to try to stop them because they cause -

- if I don't get up and move around then I get muscle cramps go up the back of the calf of my leg from them.

*              *             *

Q      Okay. Now tell me about the - - do you have any, when you're fixing food or washing the dishes do you have any problems doing that, using your hands to do that?

A      Fixing food, I can't - - I have trouble peeling potatoes because I have trouble holding onto the knife - -

Q      Peeler?

A      - - and the peelers.

Q      Uh-huh. Because you have difficulty making a fist or what?

A      Yes.

Q      As far as washing dishes, we've gone to all plastic dishes because between me dropping them and my father dropping them from the tremors she lost more dishes than she was keeping so she went to all plastic.

*              *             *

Q      Do you have any trouble typing?

A      My hands, my wrists start to hurt and my fingers cramp if I'm typing.

*              *             *

Q      How far can you walk on level ground without having to stop and rest?

A      Maybe 500 feet.

Q      Now do you go out and walk during the day?

A      Not usually.

45

Q       How long would it take you to walk 500 feet?

A       Maybe 10, 15 minutes.

Q       And what bothers you about walking after, you know, walking for 10 or 15

minutes?

A       My ankles swell and my knees start to ache.

Q       How about standing at the counter doing the food preparation or putting away the

dishes, can you stand for a half hour at a time?

A       No.

Q       What bothers you about that?

A       My legs go numb.

Q       Your legs go numb?

A       They go numb.

Q       Where do they go numb?

A       My thighs and my calves.

                        *               *               *

Q       So if you walk around for a few minutes can you come back and stand?

A       Usually I have to sit down for a few minutes and then come back.

Q       So how long can you stand before you normally have to sit down?

A       Ten to fifteen minutes tops.

Q       Did you have that problem - - well, do you have any problems sitting?

A       If I sit for long periods of time I do, yes.

Q       Can you sit for an hour at a time?

A        Not without doing a lot of moving around.

Q        How much weight can you pick up and carry?

A        Maybe ten pounds.

Q        How about - - how come you don't go grocery shopping with your Mom?

A        I don't like to go grocery shopping.

Q        Why?

A        I just never did.

                    *                    *                    *

Q        Do you have any hobbies besides, I guess, reading and sewing?  And I guess you
don't, say you don't do that anymore.

A        Reading is about the only thing that I still do that I use to as far as hobbies.

Q        Do you belong to any groups or organizations?

A        Other than church, no.

Q        Do you sing in the choir or do you - -

A        No.

Q        Are you in type of organizations with the church like sometimes there's a group
of people that might help take care of the church or a group of people that take collections,
things like that?

A        No.

Q        Do you drink alcohol?

A        No, I don't.

Q        Do you smoke?

A       Yes.

Q       How much do you smoke?

A       Half a pack a day.

                    *               *               *

Q       Do you have any trouble dressing yourself?

A       Yes, I do.

Q       What problems do you have dressing yourself?

A       I have trouble buttoning buttons.  Like this morning when I went to put this top

on I had to get help to put it on because I couldn't get my arms up to put it on.

Q       What difficulty did you have with the arms?

A       Getting my arms in but I couldn't get my arms high enough to get it down over

my head.

Q       Because you have - - what happens when you try to raise your arms up over your

head?

A       I get a pain that shoots down the middle of my spine.

                    *               *               *

Q       Do you baby sit?

A       No.

Q       Do you take care of anyone?  I guess - - do you have to do anything for your

father, I mean, help him with anything because of his Parkinson's?

A       If my Mom is not there then I help with getting his meals and that maybe a

sandwich or something like that at lunch.

Q       Do you pay the bills or - -

A       They do.

                    *              *              *

[EXAMINATION OF CLAIMANT BY HER ATTORNEY]

Q       Okay.   How do you feel in the daytime as far as your energy level?

A       I'm tired all the time.

Q       Now is that something that has happened recently or has that been around for a while?

A       That's been around for a while.

Q       Does that affect you in any way during the daytime in terms of your energy?

A       I find myself drifting off to sleep a lot.  I can be reading and fall asleep.

Q       When you are at home and you talked about kind of what you did in the daytime and, you know, you told us a little bit about things like dishes and laundry and maybe running the vacuum.  Out of a normal day how much time do you think you're actually doing something that could be considered some kind of activity, you know, where you're doing some kind of productive activity around the house, housework of some kind?

A       Maybe two hours.

Q       Is it all in one shot or kind of spread over the day?

A       It's spread out over the day.

Q       Now you indicated that your mother had to help you comb your hair.

A       Yes.

Q       Okay.  Is that because of your hands or your shoulders or what is the problem

with fixing your hair?

A       That's mostly my shoulders.

Q       Okay.  Now your shoulders, how long have your shoulders been a problem for you where you had difficulty raising them up?

A       Maybe the past year.

Q       Okay.  So that sounds like it's kind of a new problem along the say, is that right?

A       Right.

Q       Okay.  Before your shoulders flared up were you having any difficulty with doing thinks like, oh, I don't know, buttoning your clothes or holding onto objects?  In other words, were your hands giving you the problem before that, before your shoulders?

A       Yes, they were.

Q       You had the carpal tunnel syndrome surgery I think you said in, did you say 2001, in the spring of 2001, does that sound right?

A       No, it was August of 2002.

Q       August of 2002.  How long before the surgery were you having difficulties with your hands, if you know?

A       Probably five, six years before that.

Q       Okay.  So all the way back to when we were talking about before, all right.  In your everyday you've indicated that you drift off to sleep.  Do you ever deliberately nap or try to sleep?

A       If I've had, my legs have bothered me particularly bad at night I do.

Q       Okay.

A       Sometimes my legs don't wake me up, totally wake me up.

Q       Okay.

A       And I can go back to sleep but then some nights they're worse than others and then I'm kind of up and down all night.  Then I usually do lay down in the afternoon.

*               *               *

ALJ          Let me ask you a question, during a typical day at the present time, okay, and let's say from 9:00 to 5:00 tell me how much of the time you are standing and walking? Well, let's take it - - we'll break it down three ways, standing, walking, and sitting down.

ATTY         Or other?

BY ADMINISTRATIVE LAW JUDGE:

Q       Well, just in that eight hour period just tell me about your physical activities, in other words, you say sometimes you lay down during the day.  What I want to know on average, if you can estimate for me, the amount of physical activities you're doing in that eight hour period.  You mentioned two hours of doing things around the house.  I'm not sure whether that means that you're doing those things standing and walking or you're doing something else.  But with respect to, you know, a typical day how would you estimate that your activities are broken down?

A       Probably three hours standing and walking.

Q       And then five hours of sitting or - -

A       No, it's not just sitting.  It's probably more, a little bit more walking and maybe standing.  I'm not exactly sure how to - - I know what you want.

Q       Okay.

A       I'm just trying to figure out how - -

Q       And I know sometimes you might be sitting and you might get up and walk around for a few minutes and then you might sit down and might stand for a while. But I'm not necessarily asking how long you do any particular activity at a time but how you would estimate in total during that eight hour period, the total amount of time you would estimate that you walk, the total amount of time that you estimate that you stand, the total amount of time that you estimate that you sit.

A       [INAUDIBLE]

Q       Okay.

A       Okay. Probably about three hours walking.

Q       Okay. How about standing?

A       Maybe about two hours.

Q       And how about sitting?

A       Probably about three.

Q       All right. So basically you're thinking you're standing or walking, you said three hours of walking, two hours of standing, and three hours of sitting?

A       Yeah, that would be throughout the day.

Q       Okay. Now when you say throughout the day I don't want, don't want to necessarily mean from, you know, 6:00 a.m., in the morning until 9:00 at night. I'd to focus - -

A       In that eight hour period?

Q       Yeah, an eight hour period.

A       That's about right.

Q        Okay.  Well, it sounds like you're fairly active on a typical day from the standpoint of you spend a lot of time standing or walking in an eight hour period.  But I haven't heard you tell me that you walk, that you, you know, go outside and walk or so you think you're walking around in the house three hours during an eight hour day?

A        I do go outside and walk.  It's mostly just a couple times around the house - -

Q        Uh-huh.

A        - - or I walk down to my aunt's.

Q        And see how she's doing or - -

A        Right.

                    *                    *                    *

[EXAMINATION OF CLAIMANT BY HER ATTORNEY]

Q        Now, of course, the Judge is interested in what you can do and I'm interested in difficulties and things that you can't do.  And what I would like to know is during  the  course of your average day are you doing - - are you in any positions or in - - doing something that would be difficult for you to do in a job setting?  In other words, are you having to do anything like elevate your feet or lie down or get in a recliner chair, anything like that?

A        Yes, I do elevate my feet.  I do sit in a recliner.  The one that my father has, has the heating pad built in and a vibrator and that helps sometimes when my back and my shoulders are hurting me.

Q        Okay.   How to put it like this, could you just in your own words describe what kind of alternating of your position you do through the day?  In other words, I know the Judge and I have tried to get you to quantify this as much as you can.  How often do you change your

position when you're at home approximately?

A       Probably every 10 to 15 minutes.

Q       Why?

A       Like my leg's going numb.

Q       Okay.

ALJ     You can get up and walk around if that's what you want to do to be comfortable, I

mean - -

CLMT        Sometimes if I just shift a little bit - -

ALJ     Takes care of it?

CLMT        - - it takes care of it.

BY ATTORNEY:

Q       Do you understand what I'm asking you because I don't want you to get

confused.  We've been back and forth at you so many times here.

A       I do have to, you know, move around a lot.

Q       Okay.

A       Because I get cramps in my legs and have to get up and walk sometimes to get

them out.

Q       Okay.

A       I lay down.

Q       When, how often?  Give me some kind of a guideline.

A       Usually if I'm going to lie down it's in the afternoon after lunch.

Q       Is that something you do off and on?  Is that something you do on a daily basis?

Could you give me some idea of - -

A        I do - -

Q        - - the patterns?

A        - - usually lay down on a daily basis.  Sometimes I'll lay down and read or sometimes I'll lay down just to go to sleep.

Q        Is that something you normally do - - well, could you give me an idea of how long you would do that, that's just as a rule?

A        If I'm laying down to go to sleep usually a couple of hours.   If I'm laying down just to lay down maybe 45 minutes to an hour.

Q        Okay.  Well, now let me ask you how that squares with what you were talking to the Judge, okay, because we've only got an eight hour period that we're trying to focus on.  The reason we're focusing on that, that's a normal average workday.  Now apparently, if I understand what you said to the Judge, you thought you were up on your feet, I think you said you were standing maybe two hours and walking around as much as three, is that right?

ALJ            And sitting three hours.  That's what she said.

BY ATTORNEY:

Q        And sitting three hours.  Now that's a full eight hours, okay.  And so what I want to know is how these other positions fit into that.

A        Well, with the sitting I'm probably laying part of the time with the three hours.

Q        Okay.

A        And with the walking I'm probably taking a walk around the house outside and helping, you, you know, do housework in the house.

Q       Okay.  Let me ask you, do you have any difficulty finishing any of the tasks that you start around the house?

A       Not finishing them it just takes me a while to get them done.

Q       Why does it take you a while?

A       If I'm running the vacuum cleaner I can usually do a room and then I've got to stop for say five or ten minutes and then I can go back and do another room and maybe down the hallway to the next room.

Q       What are you doing during the five or ten minutes?

A       I usually have to sit down.

Q       What are you doing when you're sitting?

A       Just sit down like on the edge of the bed or if I'm in the living room sit down on the couch or on a chair.

Q       Are you talking about resting?

A       Yes.

*                *                *

[EXAMINATION OF MEDICAL EXPERT BY ALJ]

Q       All right.  Can you identify any impairments or do you feel that the claimant has with respect to her - - from a psychological standpoint?

A       Okay, the record would suggest, Your Honor, that depression and anxiety that she has as a result of her medical conditions.   However, her psychological problems would be considered moderate at worst but generally not so.  She is of average intelligence.   Her reading is at the high school or post high school level.  The recent exhibit seen today noted it was post

high school level.  Her spelling is at the high school level.  Her arithmetic is less.  She's enjoyed good grades in school.  She enjoys reading.  And we find that really she has no serious mental difficulties, Your Honor.  Therefore, does not meet any, meet or equal listing under 1200 mental disorders.

Q      All right, so the - - are you familiar with the PRT form?

A      I am, sir.

Q      And with respect to completing that form are you indicating that there's, in your opinion, that there is no severe mental impairments?

A      That would be my opinion, Your Honor.

                    *                *                *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q      Okay.   I want you to assume that the claimant would be limited to doing light work.  Would be limited to, she would be limited to using her upper extremities for reaching and handling to only occasionally.  Would be limited to stooping only occasionally.  Would not be able to do any climbing or crouching or crawling.  Would she be able to do any of her past relevant work?

A      You mind repeating that again, Your Honor, I'm sorry.

Q      That's okay.  Light work.  She'd be limited from reaching and handling to only occasionally for her upper extremities.  She would be limited to doing stooping occasionally.  Wouldn't be able to do any climbing, crouching, or crawling.

A      She would not be able to do, the heavy work would be out of the picture.  The shipping clerk at the medium level would be out of the picture as well.  The job as a secretary

she would be able to perform.  The job with PDP Corporation, data entry clerk, could be performed.  The Go Mart clerk/cashier could not be performed.  And the ATC Communication Group, that job could have been performed.

Q      All right.  I'm going to ask you another hypothetical or another question.  I want you to limit the claimant to light work but she could do six hours of standing or walking.  But she'd be limited to not doing more than a half hour of standing or walking at a time and then would have to sit down.  Could sit for at least six hours in an eight hour day but would have to be able to get up and move around about once an hour.  Would be limited to using her right upper extremities for reaching and handling to only occasionally.  Would be limited to stooping only occasionally.  Would be limited to doing fine finger manipulation and keyboarding type work to only occasionally.  Would the claimant be able to do any of her past relevant work?

A      The job with ATC Communication Group could have been performed.  The Go Mart clerk job would be out of the picture.  Would not be able to do the PDQ - - PDP Corporation data entry because it would be entering data into some type of device, computer or otherwise, depending on the systems they may have had.  Could probably have done the secretary Maryland Juvenile Detention.  Could not have done the shipping clerk.

Q      So she could have done the ATC or the Agis Communication work for Western Union and the secretarial work at Maryland?

A      Yes.

Q      Okay.  I'm going to ask you another hypothetical.  The same, using the same hypothetical as the previous one in light but limiting the claimant only occasional contact with the general public and co-workers.  Would that affect your answer, I mean does that change your

answer?

A       Seeing as it's a light level but only occasional contact with the public, is that right?

Q       Right, and also plus the co-workers.

A       Yeah.  Does that also include the previous hypothetical?

Q       Yes.

A       May I have a moment?

Q       Yes.

A       No, she couldn't do any of those jobs.

Q       All right.  I want you to assume that the claimant would be limited to doing sedentary work.  With the claimant limited to only having occasional contact with the general public and co-workers.  To only have occasional reaching and grasping with her right, or with her upper extremities.  And occasional use of her hands for fine finger manipulation and keyboarding.  Would there be any full time unskilled work that such a hypothetical  person could do in the local or national economy?

A       Can I have a few moments, Your Honor?

Q       Okay.

A       I would say no work, Your Honor.

ALJ     All right.  Do you have any questions?

ATTY Yes, sir, I do.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q       Dr. Panza, I want you to assume a person that because of fibromyalgia and other

medical problems which include symptoms of anxiety and depression, fatigue, and headaches, physical pain, that this person one-third to one of the time is not going to be able to complete a normal workday without taking too many unusual unscheduled breaks.  And would be similarly limited in maintaining regular attendance and punctuality.  And I'm wondering if a person so limited would be suitable for - -

A        I'm going to ask - -

Q        - - regular gainful - -

A        - - I'm going to ask you to - -

Q        - - full time employment?

A        - - quantify that.  In other words - -

Q        Oh, well, I can give you one quantification and that would be the amount of time that she indicated she would have down time during the relevant period just due to headaches and we're talking finally the exact - -

A        What she testified to.

Q        - - we can go with that.  I think she said that during this period she was getting about four or five headaches a week.  And I want you to assume that each one of these would take her off task on an unscheduled basis for, let's start out with an hour.

A        So is the question then that due to her impairments the claimant would be off task one hour a day outside the normal breaks and lunch breaks - -

Q        Four or five days a week.

A        - - four to five days a week?

Q        That's at the minimum based on just the headaches.

A       Okay.

Q       I'm wondering if you can answer that question quantified in that way?

A       Okay, I don't mean to complicate the matter - -

Q       That's all right.

A       - - but getting back to the latter, the last part of your hypothetical off task one-third and one half of the time.

Q       Not - -

ALJ     For the purpose of this question don't worry about that.

VE      Okay.

ATTY For the purpose of this question - -

VE      Okay.

ALJ     Is the hypothetical individual would be off task an hour a day four to five days a week - -

ATTY Unscheduled - -

ALJ     - - unscheduled - -

VE      In addition to the - -

ALJ     Normal breaks - -

ATTY Yes.

ALJ     - - and lunch break.

VE      Okay, but not in addition to the off task of one-third - -

ALJ     No.

ATTY No, no.

ALJ    No.

VE    Okay.  No, that would disqualify her.

ALJ    Okay.

ATTY So if I ask you to assume other limitations that would interrupt the workday such as falling asleep without meaning to of having to lie down or elevate her feet or any other interruptions that would just add to the picture?

VE    Yes [INAUDIBLE]

E.      Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

- Drives a car (Tr. 449, 705)

- Visits with her aunt (Tr. 704)

- Can lift ten pounds (Tr. 711)

- Can walk five hundred feet on level ground in about ten to fifteen minutes (Tr. 712, 783)

- Could peel three to four potatoes if she tried (Tr. 716)

- Makes her bed and straightens her room (Tr. 719)

- Reads her Bible for an hour in the morning (Tr. 719)

- Dusts the top of furniture (Tr. 720)

- Frequently walks in circles around her house (Tr. 721)

- Obesity (236 lbs.) (Tr. 754)

- Attends church twice per week (Tr. 779)

- Smokes half a pack of cigarettes per day (Tr. 785)


### III.  The Motions for Summary Judgment

A.     Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred: (1) in finding the Vocational Expert (VE) stated Claimant could perform her past work as an insurance clerk; (2) in determining Claimant could perform her past work as a customer service representative; (3) in failing to obtain the services of a physical Medical Expert (ME); (4) in finding various alleged impairments of Claimant not severe and in failing to consider her impairments in combination; and (5) in not accounting for Claimant's changing medical conditions over the course of time.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends the ALJ properly determined Claimant could perform her past relevant work, committed no error in not employing a physical ME, correctly determined Claimant's residual functional capacity (RFC), and properly considered Claimant's changing medical conditions.

B.     The Standards.

1.     Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S.

317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party

opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587

(1986).  However, "a party opposing a properly supported motion for summary judgment may

not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts

showing that there is a genuine issue for trial." <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242,

256 (1986).

    2.    <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive

judicial review.  <u>See</u>, 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir.

1986).

    3.    <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears

the burden of showing that she has a medically determinable impairment that is so severe that it

prevents her from engaging in any substantial gainful activity that exists in the national

economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

    4.    <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act

requires that an impairment, physical or mental, be demonstrated by medically acceptable

clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S.</u>

<u>Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§

404.1508, 416.908.

    5.    <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive

disability insurance benefits, an applicant must establish that she was disabled before the

expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42

U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.      <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will

automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.    Discussion

I.

The ALJ's Finding that Claimant Could Perform Her Past Work as an Insurance Company Clerk

Claimant first contends the ALJ erred in finding her capable of performing her past relevant work as an insurance company clerk. Claimant argues that even though the VE testified Claimant could not perform this work consistent with her limitations, the ALJ nevertheless found her capable of doing it.

Questions to a VE are only relevant insofar as they accurately reflect the limitations the ALJ ultimately determines the claimant has. 20 C.F.R. § 404.1560(b)(2). In this case, the ALJ found Claimant had the RFC for light work. (Tr. 042). He determined Claimant could "sit for one hour at a time and for a total of six hours during the eight-hour workday" and could "stand or walk for 30 minutes at a time and, in combination, for a total of six hours during the eight-hour workday." Id. Finally, the ALJ held Claimant "capable of performing fine finger manipulation and keyboarding on an occasional basis." Id. The ALJ asked the VE whether Claimant could perform any of her prior jobs consistent with these limitations. (Tr. 815). The VE responded Claimant could perform her prior work as a secretary and customer service representative. (Tr. 815-16). The VE also stated Claimant could not perform her prior work as an insurance company clerk, where she did data entry. (Tr. 815). The ALJ, however, found

Claimant capable of performing her prior work as a customer service representative and an insurance company clerk. (Tr. 043). The ALJ used this finding to deny Claimant benefits. Id. The ALJ did not find Claimant capable of doing her prior work as a secretary. Claimant contends the ALJ erred in finding her capable of doing her job as an insurance company clerk. Commissioner concedes the ALJ committed this error. Def.'s Br. at 11.

Although the parties agree the ALJ erred in finding Claimant capable of performing her prior data entry work, the ALJ's error is harmless. The situation here is closely analogous to that found in Diorio v. Heckler, 721 F.2d 726 (11th Cir. 1983). The ALJ there stated the claimant "was closely approaching advanced age," when in fact the Regulations characterized him as "closely approach[ing] retirement age." Id. at 728. The Diorio ALJ also considered work he should not have. Id. Yet because these errors did not affect the outcome of the case, the court held them harmless. Id. Similarly, in this case the ALJ's error was to find Claimant able to do her work as an insurance clerk rather than as a secretary. Without this error, the ALJ would have determined Claimant able to do her customer service representative and secretary positions. The ALJ still would have found Claimant able to do two of her prior relevant jobs. Since the ALJ would have found Claimant capable of doing the same number of prior jobs without the error, the mistake is harmless.

## II.

## The ALJ's Determination that Claimant Could Perform Her Past Work as a Customer Service Representative

Claimant next argues the ALJ's finding that Claimant could perform her past work as a customer service representative lacks substantial evidence to support it. Claimant contends that although the VE stated Claimant could perform this work, as mentioned above, the job did not fit

within the limits of the ALJ's RFC.

Social Security Ruling (SSR) 82-61 provides a claimant will be found not under a disability "if he is capable of performing his past relevant work either as he performed it in the past or as it is generally required by employers in the national economy." Pass v. Chater, 65 F.3d 1200, 1207 (4th Cir. 1995). These two methods of determining whether a claimant can do his past work "are clearly meant to be disjunctive. If the claimant is found to satisfy either test, then a finding of not disabled is appropriate." Id. (quoting Martin v. Sullivan, 901 F.2d 650, 653 (8th Cir. 1990)). SSR 82-61 was incorporated into the Regulations in 20 C.F.R. § 404.1560(b)(2). Johnson v. Barnhart, 329 F. Supp. 2d 751, 755 (W.D. Va. 2004). This section allows a VE to testify about whether a claimant can perform his past work "either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 404.1560(b)(2). The ALJ here found Claimant could perform her past customer service work both as she did it and as it is generally done in the national economy. (Tr. 043). This finding will be upheld so long as it has substantial evidence to support it. Hays, 907 F.2d at 1456.

Claimant testified regarding the requirements for her past customer service position during each of the two hearings held before ALJs.[6] At the first hearing, Claimant testified the job required its holder to sit the entire time, except for two fifteen minute breaks and one half hour break. (Tr. 698-99). She stated she was not allowed to stand while working. (Tr. 699).

---

[6] Commissioner urges the Court to disregard evidence from the first hearing since the Appeals Council vacated the first ALJ's decision and granted a new hearing. Def.'s Br. at 12. Yet the Appeals Council only vacated the first ALJ's decision. (Tr. 28). It did not order all evidence taken in the prior proceedings be disregarded. Cf. Wolfe v. Chater, 86 F.3d 1072, 1079 (11th Cir. 1996); Rohrich v. Bowen, 796 F.2d 1030, 1031 (8th Cir. 1986). This is especially evident in that the Appeals Council ordered the second ALJ to take "supplemental evidence" from a VE. (Tr. 30). The second ALJ actually incorporated the first ALJ's summary of the medical record into his decision. (Tr. 028).

Claimant again testified the job involved sitting at the second hearing, though she did not say she had to sit the entire time. (Tr. 759).

The VE at the second hearing testified the customer service position is generally performed at the sedentary level in the national economy. (Tr. 812-13). He testified Claimant could still perform this position despite her limitations in response to a question from the ALJ that included the limitations the ALJ ultimately found Claimant to have in the RFC. (Tr. 815).

Claimant's testimony makes clear she could not perform her past work as a customer service representative as she actually did it consistent with the ALJ's RFC. The RFC found Claimant capable of sitting "for one hour at a time." (Tr. 042). This implicitly means Claimant must be able to move around once an hour. This implicit limitation was made clear in the ALJ's question to the VE, where he stated Claimant must "be able to get up and move around about once an hour." (Tr. 815). Claimant testified the position required her to sit the entire time, except for three breaks. (Tr. 698-99). This testimony is undisputed. Therefore, it is clear Claimant cannot perform her past work as she actually did it.

Yet Claimant can still perform her past work as a customer service representative as it is generally performed in the national economy. The VE testified this job is sedentary in nature and

Claimant can perform it. (Tr. 812-13, 815). While the VE appears to have erroneously testified Claimant could perform this work as she actually did it, this error can easily be explained by the fact that Claimant's testimony at the second hearing was less detailed than at the first hearing. (Tr. 698-99, 758-60). The VE's testimony Claimant could perform the work as generally done remains intact. Therefore, while the ALJ's finding that Claimant could perform her past

69

customer service work lacks substantial evidence to support it, his finding that Claimant could perform the work as done in the national economy is supported by substantial evidence. This is all that is necessary to find Claimant not disabled. Pass, 65 F.3d at 1207.

While Claimant also contends the ALJ inaccurately described the demands of this position, the Court finds this argument without merit. The ALJ described this position "as sedentary in nature and requiring lifting of less than 10 pounds. She used computers and keyboards on an occasional basis." (Tr. 043). Claimant testified the job involved sitting and that she did not have to lift over ten pounds. (Tr. 759-60). Claimant testified she answered phone calls routed through a computer to her. (Tr. 759). She would then input a city and state into the computer to provide information to the caller. (Tr. 760). This is certainly much less computer contact than Claimant's past work at PDP involved. Claimant testified that job involved strictly data entry. (Tr. 766). Other persons employed by PDP handled calls. (Tr. 765). Thus, the ALJ's description of Claimant's customer service work was accurate.

Since substantial evidence supports the ALJ's determination that Claimant can perform her past relevant customer service work as it is generally performed in the national economy, Claimant fails to meet the requirements for disability at step four of the sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1560(b-c). The Court recognizes that if Claimant had known the Court would find the ALJ's finding that she could perform her prior work as an insurance clerk rather than a secretary was harmless error, she undoubtedly would have made arguments as to why she could not do her secretarial work. After all, Claimant attempted to discredit both of the prior jobs the ALJ found she can perform. The Court finds it unnecessary to consider whether Claimant can perform her prior secretarial work. The Regulations only require

Claimant be able to do "any" of her prior relevant work to deny her benefits. 20 C.F.R. §

404.1560(c). The ALJ's finding that Claimant can perform her customer service work satisfies

this requirement.

III.

The ALJ's Decision to Obtain Only a Psychological Medical Expert

Claimant argues the ALJ erred in not obtaining a physical ME to testify regarding the

extent of Claimant's impairments. Claimant argues that although the Appeals Council ordered

the ALJ to obtain the testimony of an ME, the ALJ erred by selecting an ME who could only

testify regarding Claimant's psychological conditions. Whether the ALJ should have obtained a

physical medical expert is a question of law and the ALJ's decision is therefore reviewed de

novo. Milburn, 138 F.3d at 528.

Decisions of the Appeals Council are binding upon the ALJ. 20 C.F.R. § 404.977. When

the Appeals Council remands a case, the ALJ must take the action the Appeals Council orders.

Id. An ALJ's failure to comply with an Appeals Council order may result in remand.

Geracitano v. Callahan, 979 F. Supp. 952, 957 (W.D.N.Y. 1997); Lancaster v. Sullivan, 1992

U.S. Dist. LEXIS 7057, at *12 (N.D. Ill.); see also Stewart v. Sullivan, 810 F. Supp. 1102, 1106

(D. Haw. 1993). In this case, the Appeals Council directed the ALJ to "Obtain evidence from a

medical expert regarding the nature and severity of the claimant's impairments and their impact

on her ability to perform work-related activities, including whether the impairments meet or

equal the severity of an impairment" in the Listings. (Tr. 29). The ALJ attempted to fulfill this

requirement by asking Dr. L. Leon Reid to testify at the hearing. (Tr. 804). Dr. Reid was only

qualified to testify regarding Claimant's mental impairments. (Tr. 59). The ALJ did not employ

71

an ME to testify about Claimant's physical impairments.

Ultimately, it is unclear whether the Appeals Council intended the ALJ to obtain a physical ME. The Appeals Council order remanding the case simply states the ALJ should retain "a medical expert." (Tr. 29). Claimant argues her primary medical problems are physical and a physical ME could have helped to clarify the disabilities her problems impose. Commissioner points to the fact that several physicians found Claimant could do work and there was no need for another physician to supplement these opinions. Commissioner also notes why Claimant cannot meet some of the medical listings.

After reviewing the evidence, the Court concludes the ALJ erred by failing to retain a physical ME and therefore the case should be remanded so a physical ME may testify regarding Claimant's impairments. First, the Appeals Council's order provided for the ALJ to, "if warranted and available," obtain "a consultative neuropsychological examination with psychological testing and medical source statement about what the claimant still can do despite the impairments." (Tr. 29). This was listed separately from the requirement to obtain an ME. Id. That the Appeals Council provided for the possibility of a psychological examination apart from the ME strongly implies the Council intended the ME to testify regarding physical impairments. Second, Claimant correctly notes her primary impairments are physical. The impairments the ALJ found severe – "osteoarthritis of the knees, osteoarthritis of the lumbar spine, fibromyalgia, and obesity" – are all physical. (Tr. 028). It is primarily Claimant's physical impairments that fill the record. The record does establish Claimant has some mental impairments. (Tr. 359, 361-71, 453-55, 572-73). Yet these are relatively mild. Dr. Reid testified Claimant has no severe mental impairments. (Tr. 806). It is difficult to believe the

Appeals Council wanted an ME to testify regarding Claimant's mild mental problems, but not her more significant physical ones. Thus, the case must be remanded so the ALJ may employ a physical ME. Consistent with the Appeals Council's order, the ME should testify "regarding the nature and severity of the claimant's [physical] impairments and their impact on her ability to perform work-related activities, including whether the [physical] impairments meet or equal the severity of an impairment" in the Listings. (Tr. 29).

IV.

### The ALJ's Alleged Failure to Find Various Impairments of Claimant Severe and His Alleged Failure to Consider Her Non-Severe Impairments in Combination

Claimant next contends the ALJ should have found some of her impairments as severe in addition to the ones he did find severe. Claimant presents five alleged severe impairments for the Court's consideration: (1) "hand symptoms," (2) diarrhea and constipation, (3) pleuritic chest pains and headaches, (4) hypothyroid symptoms, and (5) her sleep disorder.

An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a); see also Byrd v. Apfel, No. 98-1781, slip op. at 2 (4th Cir. Dec. 31, 1998);[7] Social Security Ruling 85-28. "Congress explicitly requires that 'the combined effect of all the individual's impairments' be considered 'without regard to whether any such impairment if considered separately' would be sufficiently severe." Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989) (citations omitted). "[T]he Secretary must consider the combined effect of a claimant's impairments and not fragmentize

---

[7] The United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for this and acknowledge them. Unfortunately, there is no better indicator of what its decision might be in this regard.

them." Id. "[T]he ALJ must adequately explain his or her evaluation of the combined effects of the impairments." Id. The ALJ's findings will be upheld as long as substantial evidence exists for them. Hays, 907 F.2d at 1456.

The ALJ's findings are supported by substantial evidence and should therefore be affirmed. The ALJ found Claimant had severe impairments of "osteoarthritis of the knees, osteoarthritis of the lumbar spine, fibromyalgia, and obesity." (Tr. 028).

While Claimant argues her difficulties with her hands should have been included even though they stemmed from her fibromyalgia, the ALJ correctly noted her symptoms were merely a "fibromyalgia syndrome component." (Tr. 030, 588). The ALJ accounted for her hand problems by finding fibromyalgia a severe impairment. (Tr. 030).

Although Claimant contends the ALJ omitted discussion of the diarrhea and constipation she continues to have from her abdominal conditions, the ALJ in fact stated that the "record fails to support the claimant's complaints of ongoing problems . . . related to her history of abdominal surgeries." (Tr. 029). The record documents Claimant has a history of diarrhea. (Tr. 189). Yet the ALJ noted Claimant denied gastrointestinal disease, including diarrhea, in 2000. Id.; (Tr. 255). Dr. Noronha, while finding Claimant had abdominal pain and blood in her stool, made no finding of diarrhea or constipation. (Tr. 458). Thus, the ALJ had substantial evidence for finding this to not be a severe impairment.

Regarding Claimant's alleged pleuritic chest pains and headaches, the ALJ noted the last documented episode of chest pain was in 1999 – before the alleged onset date. (Tr. 029). Claimant denied chest pain several times. (Tr. 255, 460, 557). Claimant also denied headaches. (Tr. 255, 557). Hence, substantial evidence exists here as well. The Court notes that even aside

from this evidence, Claimant argued her chest pains, and headaches are symptoms of her fibromyalgia, meaning they were accounted for by the finding of fibromyalgia as a severe impairment. (Tr. 028).

Claimant does have a relevant history of hypothyroidism. (Tr. 448, 460, 559). As the ALJ noted, however, she has takes medication for this. (Tr. 460). The Fourth Circuit has held that if an impairment "can be reasonably controlled by medication or treatment, it is not disabling." Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). The Court also notes where the record mentions hypothyroidism, it receives scant attention. (Tr. 448, 460, 559). Furthermore, Claimant seems to again suggest her hypothyroidism is, at least in part, caused by her fibromyalgia. To this extent, the ALJ again accounted for this impairment by finding her fibromyalgia severe. (Tr. 028).

Claimant also has a sleep disorder, but like her hypothyroidism, it does not impose severe limitations. Dr. Young found in July 2004 that Claimant's elevated limb movement represented a sleep disorder. (Tr. 649-50). Yet by November 2004, Dr. Mudry was able to report Claimant "does not wake up at all at night now." (Tr. 679). Hence, substantial evidence supports the ALJ's decision that this is not a severe impairment.

Finally, the ALJ adequately considered the combined effects of Claimant's non-severe impairments, as required by 20 C.F.R. § 404.1520(a)(4)(ii). For instance, the ALJ found Claimant's complaints of pain in her hand were a component of her fibromyalgia, which the ALJ found severe. (Tr. 028-030). Many of Claimant's non-severe impairments could not be considered in combination with other impairments since the ALJ found they did not meet the duration requirement of twelve months. 20 C.F.R. § 404.1509; (Tr. 028-029). The Regulations

provide that while a combination of non-severe impairments may be severe, it must still exist for at least twelve months. 20 C.F.R. §§ 404.1520(a)(4)(ii); 404.1509. The ALJ found that while Claimant had left hip trochanteric bursitis at one time, the record failed to demonstrate it lasted for twelve months. (Tr. 028). The ALJ pointed out that while Dr. Pavlovich diagnosed Claimant as having this in 1999, subsequent treatment notes contain no mention of it. Id.; (Tr. 261-66). Dr. Pavlovich reported Claimant to not have the ailment in 2000. (Tr. 028, 456). The ALJ found likewise concerning Claimant's impairment of de Quervain's tenosynovitis, noting that Claimant was first diagnosed with it in 2000, and in that same year recovered from it. (Tr. 028, 266, 325, 379).[8] Again, the ALJ found that while Claimant received a diagnosis of carpal tunnel syndrome in 2001, the ALJ determined she recovered from it less than a year later. (Tr. 028-029, 487, 496). The ALJ determined Claimant had no medically determinable impairment whatsoever from her alleged headaches. (Tr. 029, 255, 557). Thus, the ALJ properly considered the combined effects of Claimant's impairments.

V.

<u>The ALJ's Finding of Only One RFC for Claimant</u>

Claimant finally contends the ALJ failed to account for the reality that the severity of her impairments has changed over time. She argues the ALJ should have calculated a new RFC each time her condition changed.

The ALJ was not required to find multiple RFCs for Claimant. The Regulations speak of determining a claimant's RFC in the singular. 20 C.F.R. § 404.1545. The Regulations provide

---

[8] The ALJ stated Claimant was first diagnosed with this condition in June 2000. (Tr. 028). She was actually diagnosed with this condition in February 2000. (Tr. 266). The difference is irrelevant, however, since the record still indicates Claimant had de Quervain's tenosynovitis for less than a year.

the ALJ "will assess your residual functional capacity based on all the relevant evidence in your case record." 20 C.F.R. § 404.1545(a)(1). They also speak of "developing your complete medical history" before calculation of the RFC. 20 C.F.R. § 404.1545(a)(3). Obviously, not all the evidence the ALJ will evaluate was produced at the same time. Under Claimant's theory, the ALJ would have to find a new RFC every time one of these pieces in the evidence indicated a claimant had different abilities. This is clearly not the case under the Regulations.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to the Commissioner so she employ a physical medical expert to evaluate the nature and severity of Claimant's ailments and how those impairments affect her ability to perform work related functions, including whether her ailments meet or equal a Listing at step three of the sequential evaluation process.

2. Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment

of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED: November 7, 2006

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE